IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal Action No. **3:13-CR-00013-L** |
| | § | |
| **MARCOS ANTONIO GARCIA** | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion to Suppress Evidence (Doc. 21), filed June 10, 2013. After carefully considering the motion to suppress, response, reply, briefing, evidence, applicable law, witness testimony, and oral arguments by the parties, the court **grants** Defendant's Motion to Suppress Evidence (Doc. 21).

**I.      Factual and Procedural Background**

In Defendant's Motion to Suppress Evidence, Marcos Antonio Garcia ("Defendant" or "Garcia") asks the court to suppress all evidence derived from and statements made as a result of the warrantless search of the pickup truck he was driving on March 6, 2012, on Interstate Highway 35 ("Interstate" or "Interstate 35"). Garcia contends that Texas Department of Public Safety Trooper Thomas Ladd ("Trooper Ladd") did not have probable cause or reasonable suspicion to conclude that he had committed a traffic violation and unreasonably searched and seized the pickup truck he was driving when Trooper Ladd stopped him as he was traveling northbound on Interstate 35, a few miles north of Waco, Texas. Garcia further asserts that his consent to search did not cure the taint of the unconstitutional traffic stop.

**Memorandum Opinion and Order – Page 1**

## II. Validity of Initial Traffic Stop

### A. The Parties' Contentions

The basis for the traffic stop, according to Trooper Ladd, was that Garcia was driving in the left lane of Interstate 35 without passing in violation of section 544.011 of the Texas Transportation Code. Garcia contends that driving in the left lane of the highway without passing is not a traffic violation of the Texas Transportation Code, or any other Texas law, and that Trooper Ladd lacked articulable facts to support a reasonable suspicion that he had committed any offense. Garcia therefore contends that the stop violated the Fourth Amendment to the United States Constitution ("the Fourth Amendment"), and that all evidence obtained during the stop and seizure, including the methamphetamine found in the truck and any incriminating statements by him during the time he was detained, should be suppressed.

Garcia further asserts that, even assuming that driving in the left lane without passing is a violation of Texas law, he did not commit a traffic violation and Trooper Ladd did not follow him long enough to determine whether he had actually committed a traffic violation. Garcia contends driving in the left lane without passing is not immediately evident as are other traffic offenses such as driving without headlights, speeding, or running a red light or stop sign. He contends that determining whether the offense of driving in the left lane without passing has occurred requires a longer observation time than that required for the listed traffic violations. Garcia contends that Trooper Ladd observed him for only one mile, and, during that time, Garcia passed the Trooper and at least one other car and was in the process of passing a big rig truck when he was pulled over. Garcia also notes that Trooper Ladd witnessed at least 20 other vehicles driving in the left lane that, like Garcia, did not move into the right lane after passing his patrol car. Garcia therefore questions

Trooper Ladd's proffered justification for stopping him and contends that Trooper Ladd has not articulated any facts to support an objective suspicion that he passed and disregarded a "Left Lane for Passing Only" sign before being pulled over.

The Government counters that the evidence obtained as a result of the traffic stop is admissible because the stop that precipitated the search and discovery of more than 11 kilograms of methamphetamine drugs and other evidence was lawful and justified. According to the Government, Garcia only challenges the legality of the initial traffic stop and does not challenge the voluntariness of his incriminating statements or consent to search the vehicle or the scope of the search. The Government therefore contends that the only issue for the court to decide is whether the evidence obtained and Garcia's incriminating statements should be suppressed as fruit of the poisonous tree based on his contention that they were obtained as a result of an illegal stop for a nonexistent traffic violation. The Government asserts that Garcia's argument in this regard fails because driving in the left lane without passing where prohibited is a violation of Texas law. For support, the Government cites Texas Transportation Code sections 544.011, 544.04(a), 541.304(1), 542.301(a) and (b), and 542.401. In its responsive brief, the Government also relies on the following cases: *United States v. Castro*, 480 F. App'x, 782, 784 (5th Cir. June 27, 2012) (unpublished); *Abney v. State*, 394 S.W.3d 542 (Tex. Crim. App. 2013); and *Baker v. State*, 50 S.W.3d 143 (Tex. App. Eastland 2001, pet. ref'd).

The Government contends that the stop in this case was justified at its inception because Trooper Ladd had an objectively reasonable suspicion that illegal activity was occurring, that is, "that Garcia was driving in the left lane and not passing where prohibited after having passed a sign legibly indicating the same, in violation of Tex. Transp. Code § 544.01." Government's Resp. 7. The Government asserts that Trooper Ladd first observed the truck driven by Garcia around mile

**Memorandum Opinion and Order – Page 3**

marker 352 when Garcia passed him in the left lane of a two-lane stretch of highway on Interstate 35. According to the Government, once Garcia passed Trooper Ladd, Garcia drove in the left lane for approximately one mile and failed to move into the right lane even though he had the opportunity to do so. Having made this observation, Trooper Ladd "had ample specific, articulable facts that not only gave rise to a reasonable suspicion but also probable cause that Garcia had violated Section 544.011," according to the Government. *Id.*

In addition, the Government maintains that Trooper Ladd had a reasonable basis to believe that Garcia was aware that driving in the left lane without passing was prohibited on this particular stretch of Interstate 35 because there are signs to this effect at mile markers 320, 326, and 347, which according to the Government, "Garcia passed no more than a mere 5 miles before he was pulled over." *Id.* (citing Videotape at 49:43). The Government acknowledges that Trooper Ladd did not see Garcia pass any sign that prohibited driving in the left lane without passing. The Government nevertheless contends that it was reasonable for him to infer that Garcia had passed and seen the sign at marker 347 because it was only a short distance away.

The Government further asserts that Trooper Ladd was not required to actually witness Garcia passing a "Left Lane for Passing Only" sign because "[c]ourts have repeatedly sanctioned traffic stops for Section 544.011 violations where reasonable suspicion was based not on the officer seeing the defendant pass the sign, but rather, based on a reasonable inference that he passed it. For support, the Government cites: *Baker*, 50 S.W.3d at 145; *Mouton v. State*, 101 S.W.3d 686, 690 (Tex. App. Texarkana 2003, no pet.); and *Green v. State*, 93 S.W.3d 541, 545 (Tex. App. Texarkana 2002, pet. ref'd). Additionally, regarding Garcia's contention, based on the videotape, that Trooper Ladd targeted Garcia but did not stop any of the other numerous vehicles on the Interstate that were also driving in the left lane without passing, the Government responds that

whether other vehicles were also committing the same violation is irrelevant and has no bearing on whether Garcia himself was committing a violation and whether Trooper Ladd's decision to stop Garcia was unlawful. Government's Resp. 8 n.2.

In his reply brief, Garcia asserts that none of the courts in the cases relied on by the Government held that driving in the left lane without passing is a per se traffic offense, and that every case cited is distinguishable and therefore inapplicable to this case. Garcia maintains that *United States v. Castro* is distinguishable from this case because the court in that case acknowledged that "Castro traveled by a sign notifying drivers of the left-lane travel restriction," which is disputed in this case. Def.'s Reply 6. Garcia contends that the Texas Court of Appeal's opinion in *Baker v. State* was similarly predicated on the assumption that the defendant had passed and seen a "left lane for passing only" sign. Garcia asserts that *Green v. State* is distinguishable because it involved a single vehicle and the trooper's patrol car, whereas the stop in this case occurred when there were many drivers on the road. Garcia contends that *Green* is also distinguishable because it involved a second sign that directed slower traffic to keep right and served as the basis for the stop. Garcia maintains that the reasoning in *Castro*, a 2011 case relied on by the Government, is inapposite because the Fifth Circuit in that case did not have the benefit of the decision by the Texas Court of Criminal Appeal in *Abney*, and the court's reasoning in *Castro* is undermined by *Abney*. Garcia therefore contends that the court should decline the Government's invitation to apply the reasoning in *Castro*.

Garcia asserts that if the court determines that the stop was invalid, it need not go any further and must grant his motion to suppress. Even if the court determines that driving in the left lane without passing is a traffic offense in Texas, Garcia contends that Trooper Ladd's mere suspicion that he had committed the offense is objectively unreasonable because Trooper Ladd did not know

**Memorandum Opinion and Order – Page 5**

whether he had passed a sign, and the Government does not account for the three on-ramps (entry ramps) to Interstate 35 north between the mile marker 347 and the place where he was stopped at mile marker 352. Garcia therefore maintains that under *Abney*, which distinguished *Green*, *Baker*, and *Mouton*, any suspicion by Trooper Ladd that he had passed the sign at mile marker 347 was not objectively reasonable. Garcia further asserts that Trooper Ladd's mere speculation or suspicion that he may have passed a sign does not rise to the level of reasonable suspicion necessary for a warrantless *Terry* stop and seizure. Garcia therefore contends that suppression is required.

### B. Legal Standard Applicable to Warrantless Traffic Stops

"The Fourth Amendment protects individuals from unreasonable searches and seizures. Traffic stops are considered seizures within the meaning of the Fourth Amendment." *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Whether a seizure is reasonable is determined by considering: (1) "whether the officer's action was justified at its inception," and (2) "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968)). "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno,* 420 F.3d 420, 430 (5th Cir. 2005) (citing *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)).

When an officer conducts a traffic stop without a warrant, the government has the burden of proving that an objectively reasonable suspicion existed for the stop. *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010); see also *United States v. Matlock*, 415 U.S. 164, 177-78 n.14 (1974) (concluding that the government bears the burden of proving at a suppression hearing by a

preponderance of the evidence that the Fourth Amendment has not been violated). Objectively reasonable suspicion exists when an officer "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* In determining whether an officer had a "particularized and objective basis for suspecting legal wrongdoing," the court looks at the "totality of the circumstances in each case." *Id.* "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *United States v. Miller*, 146 F.3d 274, 277 (5th Cir. 1998) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). In evaluating the officer's basis for suspecting wrongdoing, reasonable suspicion need not rise to the level of probable cause but must amount to more than mere inarticulate hunches. *Terry*, 392 U.S. at 27.

In *Abney*, the Texas Court of Criminal Appeals concluded that driving in the left lane without passing can constitute a violation or traffic offense under the Texas Transportation Code *in certain situations*. Specifically, the court considered "whether driving in the left lane without passing can amount to a traffic violation if there is no sign prohibiting the conduct at the time and place of the alleged violation" and concluded:

> The Transportation Code certainly indicates that if there is a sign present that says the left lane is for passing only, then it is a traffic offense to travel in the left lane when not passing another vehicle. Section 544.004(a) states that an operator of a vehicle shall comply with an applicable official traffic control device such as a "left lane for passing only" sign. Without such a sign present within a reasonable distance of the traffic stop, there is no offense.

*Id.* at 548 (emphasis added). Thus, the determination as to whether a "left lane for passing only" sign applies and a violation of section 544.004 has been committed depends on the facts of each case. *Id.* at 549-50.

The court in *Abney* recognized that there is no bright line rule in determining whether an offense has occurred for driving in the left lane without passing but indicated that the following factors should be considered: (1) whether the motorist passed the traffic sign; (2) whether facts exist from which the officer can reasonably infer that the motorist passed the traffic sign; (3) the distance the officer followed the motorist before effecting the stop; and (4) the existence of entrances onto the highway between the sign and the location of the stop. *Id.* at 550. For the reasons herein discussed, the court concludes that all of these factors weigh in favor of Garcia, and Trooper Ladd therefore did not have an objective, reasonable suspicion to believe that Garcia committed the offense of driving in the left lane without passing.

**C. Analysis**

**1. No Reasonable Suspicion to Effect Traffic Stop**

On August 16, 2013, the court held a hearing on Garcia's motion to suppress at which Trooper Ladd testified. At the hearing, the Government took the position that the purpose of traffic control devices such as "left lane for passing only" signs is not necessarily to notify motorists of the traffic rules that apply on a certain stretch of highway but instead to *remind* them that traffic rules apply. The Government therefore apparently contends that the existence of a "left lane for passing only" sign in the near vicinity is not a prerequisite for a valid traffic stop on this basis. At one point during the hearing, Trooper Ladd similarly testified that he believed there was a general prohibition against driving in the left lane without passing regardless of whether a sign is present but later retreated from that position.

Aside from the inconsistencies in Trooper Ladd's testimony, the Government's argument in this regard is seriously undercut by the Texas Court of Criminal Appeals' reasoning in *Abney*, which emphasized the importance of notice. As noted in *Abney*, the purpose of regulatory signs is *not to*

*remind* drivers of traffic laws or regulations but instead to give them "*notice* of traffic laws or regulations." *Id.* at 549 (emphasis added). For this reason, the court concluded, based on the Texas Manual on Uniform Traffic Control Devices, that such "signs are required to be installed at or near where the regulations apply." *Id.* The court therefore rejects any contention by the Government to the contrary. If *Abney* is to have any validity, notice of driving in the left lane without passing is of paramount importance. The court therefore concludes, based on *Abney*, that disobeying a traffic control device, such as a "left lane for passing only" sign, can constitute an offense but only if a driver had "notice" of the traffic control device and failed to obey it. The issue therefore is whether Garcia had notice of a "left lane for passing only" sign and failed to obey it.

It is undisputed that Trooper Ladd did not observe Garcia passing a "left lane for passing only" sign and did not observe when Garcia got onto the Interstate before Trooper Ladd stopped him. It is also undisputed that there are three on-ramps or entrance ramps to Interstate 35 North between mile marker 347 where the sign was posted and mile marker 352 where Garcia was stopped. Because Garcia could have entered the Interstate on any of these three ramps *after mile marker 347*, the court concludes that it was unreasonable for Trooper Ladd to suspect that Garcia had passed a sign at mile marker 347 or earlier, as he is not clairvoyant and had absolutely no way of knowing when Garcia entered the highway.

Because of the existence of the three entrance ramps, the Government's reliance on *Baker*, *Mouton*, and *Green* is misplaced, as there was no discussion in these cases regarding entrances onto the highway. The facts in this case are more analogous to those in *Abney*. Like Trooper Ladd, the police officer in *Abney* did not know at what point the defendant entered the highway. *Abney*, 394 S.W.3d at 549. As previously noted, the court in *Abney* concluded that the existence of entrances onto the highway between the sign and the location of the stop is a factor to be considered in

**Memorandum Opinion and Order – Page 9**

evaluating the totality of the circumstances. *Id.* at 550. According to *Abney*, the purpose of a traffic sign is to provide motorists with notice of traffic regulations; however, *there is no notice when a motorist enters the highway at some point after the traffic sign*. Thus, even if the sign is located only one or two miles from the location of the stop, the existence of entrances onto the highway between a traffic sign and the location of the stop undermines any inference that the motorist passed the sign, unless of course the officer knew that all three on-ramps were closed or temporarily blocked. Reading *Abney* any other way totally eviscerates its holding insofar as notice to motorists is required.[1]

Although the Government contended during the hearing that it was reasonable for Trooper Ladd to infer that Garcia did not enter Interstate 35 from any of the three ramps because of his experience and familiarity with the area surrounding the three ramps at issue, the Government's argument and Trooper Ladd's testimony to this effect are specious and appear to have been nothing more than an afterthought in response to the motion to suppress. The court is therefore not convinced that this played any role in the officer's decision to initiate the stop. The court found Trooper Ladd's testimony and the manner in which he responded to the Government's questioning to be less than forthright, as it was apparent from his demeanor that he was not entirely comfortable in responding to the Government's questions regarding the area and amount of traffic related to the three entrance ramps and whether this information played a role in his decision at the time to stop Garcia. In responding to this line of questioning, Trooper Ladd frequently shifted his position in the

---

[1] The Government's reliance on the Fifth Circuit's 2012 opinion in *Castro* is similarly misplaced, as the issue of whether there were any entrances onto the highway between the sign and the location of the stop was not raised. More importantly, that case interpreted Texas state law prior to the time the Texas Court of Criminal Appeals considered the issue. In other words, *Abney* clarified and shed light on the factors necessary to determine whether a violation has occurred when there is a "left lane for passing only" sign. Thus, *Abney* is the state of the law as to the current relevance and construction of the statute at issue, and the court is bound by the state court decision in *Abney* that was not available when the Fifth Circuit decided *Castro*.

witness chair, paused for long periods of time before answering, and struggled to answer the questions posed.

Even assuming that Trooper Ladd did account for the three ramps before stopping Garcia, the court is not persuaded by the Government's argument that it was reasonable for him to infer that Garcia did not enter the Interstate using any of the three entrance ramps. While Trooper Ladd testified that these entrance ramps connect to farm-to-market roads that are not heavily traveled, he acknowledged on cross-examination that these are not entrance ramps from nowhere, that is, there are homes, farms, and gas stations in the vicinity. Further, as the court explained during the hearing, the mere presence of the three entrance ramps in this short stretch of Interstate 35 strongly suggests that the state, federal government, or whomever was responsible for designing and constructing the Interstate, believed that there was a need for the three entryways onto the freeway and a sufficient level of traffic to warrant their construction at the respective locations. Accordingly, any "inference" by Trooper Ladd that Garcia did not likely enter the Interstate on any of these three ramps was not reasonable, as it would have been based on nothing more than a hunch or sheer speculation. For this reason, the court concludes that the Government has failed to meet its burden of establishing by a preponderance of the evidence that Trooper Ladd had reasonable suspicion to effect the stop of Garcia's vehicle.

### 2. Insufficient Time to Determine whether Violation Occurred

The videotape of the traffic stop and events leading up to the stop reveal that after passing Trooper Ladd, Garcia passed one car, which exited the highway as he was passing it, and he was gaining speed on a large rig truck in the right lane as both vehicles drove up a slight incline in the road. Upon seeing the white Ford pickup truck driven by Garcia, Trooper Ladd ran a license check to verify whether the registration for the vehicle was up-to-date. According to Trooper Ladd's

testimony, it took him approximately five to ten seconds to run the license check. It is apparent from the videotape and Trooper Ladd's testimony that he determined Garcia had committed a traffic violation and made the decision to pull him over within the first 25 seconds of seeing the white Ford pickup truck and running the license and registration check. To effect the traffic stop, Trooper Ladd quickly increased his speed, while remaining in the right lane, to close the gap between his patrol car and the pickup truck driven by Garcia.[2]

Trooper Ladd testified at the hearing that he believed Garcia had committed a traffic violation when he failed to move into to the right lane in front of his patrol car almost immediately after passing him. Trooper Ladd testified that, in his opinion, Garcia had enough room at this time after passing him to safely move into the right lane in front of his patrol car. Trooper Ladd therefore believed that Garcia could have and should have moved into the right lane after passing his patrol car rather than continuing to drive in the left lane. According to Trooper Ladd, Garcia violated section 544.011 of the Texas Transportation Code when he failed to do so.

Garcia, on the other hand, asserts that because the trooper quickly accelerated and drove quite close to his vehicle for the majority of time before signaling for him to pull over, it would have been unsafe for him to move into the right lane in front of the patrol car after passing it, as he would have risked cutting off the Trooper and committing a traffic violation for making an unsafe lane change. Garcia also contends that there was no need for him to move into the right lane because it is apparent from the videotape that he was in the process of passing two other vehicles after he passed Trooper Ladd's patrol car.

---

[2] Trooper Ladd testified that he would normally get behind a vehicle to effect a traffic stop but could not safely do so in this case because of the silver minivan behind Garcia.

On cross-examination, Trooper Ladd acknowledged that it would have been unsafe for Garcia to move into the right lane in front of his patrol car after he accelerated and closed the gap between his patrol car and the white pickup truck driven by Garcia. Trooper Ladd also acknowledged that, in his experience as a law enforcement officer, it is uncommon for a motorist to move his vehicle in front of a marked police car that is accelerating. Given the short window of time that Garcia had to move into the right lane before Trooper Ladd increased his speed and that Garcia was in the process of passing two other vehicles, the court determines that Garcia's failure to *immediately* move to the right lane after passing Trooper Ladd was not a violation of an applicable traffic law or regulation.

The traffic offense for which Garcia was stopped is not always one which can be readily determined. When most traffic violations occur, it is readily apparent to the law enforcement officer. The court believes that the trooper did not allow sufficient time for the traffic offense to occur. Based on the record before it, the court therefore concludes for the reasons herein explained that Trooper Ladd did not have reasonable suspicion to believe that Garcia had committed a traffic violation by driving in the left lane without passing in violation of the statute.

### 3. Inability to Articulate Reasons for Stopping Garcia's Vehicle

Although Trooper Ladd purports to have stopped the pickup truck driven by Garcia for a traffic violation, this assertion does not square with the evidence as a whole. The videotape reveals that before Trooper Ladd stopped Garcia, a number of vehicles passed him and did not move into the right lane, but he did not stop any of them, even though he actually observed one vehicle passing the traffic sign at mile marker 347. While the court agrees with the Government that Trooper Ladd's decision to stop Garcia and not the drivers of the other vehicles, who were engaging in the

same alleged traffic violation, ordinarily is not relevant to whether Garcia committed a traffic violation, the facts of this case are anything but ordinary, as will be explained.

Although asked a number of times by counsel and the court, Trooper Ladd was unable to recall or articulate any reason for choosing to stop Garcia rather than the numerous other drivers on the highway the day that he observed driving in the left lane without passing another vehicle. Trooper Ladd was also unable to recall why he made the decision to run a license check on the white Ford pickup truck driven by Garcia and whether he ran license or registration verification checks for any of the other vehicles that passed him in the left lane. The court observed between fifteen and twenty vehicles pass Trooper Ladd in the left lane, and he made no effort to stop any of the violators, not even the one that he actually observed passing the sign at mile marker 347. Only the incurable optimist, the ingenuous, or those who deliberately turn a blind eye would not have reason to believe that something is wrong with this picture. In other words, an objective observer, after reviewing all of the evidence, would recognize that "there's a dead cat on the line."

The court has racked its brain and pored over the evidence to come up with the real reason for the traffic stop, and only one makes any sense under the facts and circumstances presented, including Trooper Ladd's testimony and his statements on the video made to a fellow law enforcement officer as to what he observed before he effected the traffic stop. The court is convinced that Trooper Ladd decided to stop Garcia's vehicle only after he ran a license check and determined that the vehicle was registered in Laredo, Texas, a city on the border between the United states and Mexico, in which substantial amounts of illegal drugs enter this country.[3] Because of this information, the presence of the lawn mower and ladder in the bed of the pickup truck some 351

---

[3] Pursuant to Federal Rule of Evidence 201, the court takes judicial notice of the fact that Interstate 35 North starts in the city of Laredo, Texas.

miles or so from Laredo, Texas and without any objective facts Trooper Ladd surmised that the vehicle could be carrying illegal drugs. The stop for an alleged traffic violation of driving in the left lane without passing was only a pretext for the Trooper's hunch that the pickup truck might be transporting contraband. Trooper Ladd's dogged and relentless efforts to locate illegal drugs, his decision to prolong the detention long after completing the record checks, and his decision to move Garcia's vehicle to two different locations off the Interstate where extensive searches of the vehicle were conducted confirm and reinforce the court's observation.

Trooper Ladd's inability to remember or explain his reasons for choosing to stop Garcia and no other drivers seriously undermines his overall credibility, including his purported justification for stopping the white Ford pickup truck driven by Garcia driving in the left lane without passing. The Government attempted to attribute Trooper Ladd's lack of memory to the passage of time (approximately 17 months) since the stop. As explained by the court, however, this was not a routine traffic stop involving the mere issuance of a citation. The traffic stop at hand lasted approximately three hours and resulted in the recovery of a substantial amount of methamphetamine.

### III. Whether Garcia's Consent to Search Cured the Taint of the Illegal Stop

Having determined that the traffic stop was unconstitutional, the court next addresses Garcia's contention that his consent to search the vehicle did not cure the taint on the evidence found during the search or the incriminating statements he made while detained. Garcia maintains in his motion that, under the fruit of the poisonous tree doctrine, all evidence obtained as a result of the illegal stop must be suppressed. Def.'s Mot. 10 n.29. During the hearing on Garcia's motion, the court inquired whether the parties intended to put on any evidence or make any arguments regarding this issue. The Government indicated that it did not intend to address the issue. Garcia similarly indicated that he did not intend to do so and was standing on his "pleadings," which the court

construed to mean that he was standing on the arguments in his briefing submitted in support of the motion to suppress. Accordingly, the court only considers the parties' briefs in resolving this issue.

Under the fruit of the poisonous tree doctrine, all evidence obtained from an illegal search or seizure "must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation." *Miller*, 146 F.3d at 279 (citing *Brown v. Illinois*, 422 U.S. 590, 597-603 (1975)). When evidence is obtained pursuant to a consent to search that "follows on the heels of a fourth amendment violation," a two-pronged inquiry is used to determine whether the consent is valid. *United States v. Vega*, 221 F.3d 789, 801 (5th Cir. 2000), *cert. denied*, 531 U.S. 1155 (2001). Under this inquiry, the court considers: (1) whether the consent itself was voluntarily given, and (2) whether the consent was an independent act of free will, that is, whether the consent "was independent of the violation to such a degree as to cause a 'break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation.'" *Id.* (quoting *Miller*, 146 F.3d at 279).

The first prong of this inquiry focuses on whether the consent was obtained by coercive tactics. Six factors, none of which is dispositive, are considered in determining whether consent to search was voluntarily and freely given: "1) the voluntariness of the defendant's custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the defendant's cooperation with the police; 4) the defendant's awareness of his right to refuse consent; 5) the defendant's education and intelligence; and 6) the defendant's belief that no incriminating evidence will be found." *United States v. Macias*, 658 F.3d 509 (5th Cir. 2011) (quoting *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000)). The second prong focuses on whether the causal chain between the constitutional violation and consent was broken. *Miller*, 146 F.3d at 279; *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). To determine whether the causal chain was

broken, the court considers: "(1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct." *Miller*, 146 F.3d at 279; *Chavez-Villarreal*, 3 F.3d at 127-28.

Consent to search that is voluntarily given "may, but does not necessarily, dissipate the taint of a fourth amendment violation." *Chavez-Villarreal*, 3 F.3d at 127 (citing *Brown*, 422 U.S. 590 (1975)). Thus, a determination that consent was voluntarily given does not end the court's analysis because it must still determine whether the causal chain between the illegal stop and the defendant's consent was broken. The government has the burden to prove the admissibility of challenged evidence, and when the consent to search follows a constitutional violation, the government's burden is "significantly heavier." *Miller*, 146 F.3d at 279; *Chavez-Villarreal*, 3 F.3d at 127.

Garcia focuses on the second causation prong and contends that even assuming his consent was voluntarily given, the consent was not valid because the causal chain between the illegal stop and his consent was not broken by any intervening events. Def.'s Mot. 10 n.29; Def.'s Reply 9. The Government does not address this contention by Garcia and does not offer anything to establish that there was a break in the chain of events.

After reviewing the only evidence as to this issue, the videotape of the traffic stop and detention, the court determines that the challenged evidence is not admissible as a result of Garcia's consent. Garcia initially consented to a search of the vehicle eight minutes into the stop and detention that ultimately lasted approximately three hours. R. 17:56-20:02. Six minutes later, Trooper Ladd asked Garcia if he could look through the vehicle "real fast," but he had already made clear that he was going to require Garcia to exit the Interstate and go to another location where the detention would continue. R. 25:15-26:38. Trooper Ladd decided early in the detention, after learning that Garcia had a prior arrest for drug possession several years ago and was traveling from

Laredo, Texas, that he was going to prolong the detention, even after completion of the records check, to search the vehicle for drugs and made arrangements for a K-9 officer and drug detection dog to meet him at the secondary location before seeking Garcia's consent to search. *See United States v. Santiago*, 310 F.3d 336, 343 (5th Cir. 2002). In light of this fact and because the initial consents occurred a short time after Garcia was stopped, the court concludes that they were contemporaneous with the constitutional violation and no intervening circumstances occurred between the illegal stop and these consents. *Id.*

While Garcia appears to have again consented to continuation of the search much later in the detention, refusal at this time would have been pointless, as Trooper Ladd had already informed him that the police dog alerted to the presence of drugs on the driver's side of the vehicle. R. 1:19; *Chavez-Villarreal*, 3 F.3d at 127-28 (concluding that any refusal by the defendant to consent would have been pointless because the officer "had made known his suspicions about narcotics."). Moreover, at no time during the detention was Garcia advised that he could refuse to consent or that he was free to go, and there is no reason to think that Garcia or a reasonable person would believe that he was free to go at anytime during the three-hour detention. *See United States v. Benavides*, 291 F. A'ppx 603, *4 (5th Cir. Aug. 27, 2008) (unpublished) (citing *Santiago*, 310 F.3d at 343; and *United States v. Jones*, 234 F.3d 234, 243 (5th Cir. 2000)). For a majority of the detention, he was detained in the patrol car and later handcuffed. R. 2:14. Trooper Ladd also kept the keys to the pickup truck and Garcia's cell phone. R. 28:44.

Even assuming that Garcia voluntarily consented to the search, the court concludes that the consent was not valid because the causal chain between the illegal stop and Garcia's consent was not broken. The search was therefore nonconsensual and not an independent act of free will, but rather a product of the unlawful stop. *Id.* Accordingly, in light of the heightened standard applicable

to consensual searches subsequent to an illegal stop, the court concludes that the Government has not met its burden of establishing that Garcia's consent to search cured the taint of the unconstitutional stop. The drug evidence and any incriminating statements obtained during the illegal stop and search will therefore be suppressed.

## IV. Conclusion

After carefully considering the motion to suppress, response, reply, briefing, evidence, applicable law, witness testimony, and oral arguments by the parties made during the hearing held on August 16, 2013, the court **concludes** that Defendant's Motion to Suppress Evidence (Doc. 21) should be and is hereby **granted**. Accordingly, all evidence obtained as a result of the traffic stop of the white Ford pickup truck driven by Garcia on March 6, 2012, including the methamphetamine evidence seized and any incriminating statements made by Garcia and obtained during the illegal stop and search, is hereby **suppressed** and may not be used during the trial of this case. **The parties are hereby directed to inform the court by October 11, 2013, of a suitable date for the trial of this case.**

**It is so ordered** this 7th day of October, 2013.

*[signature: Sam A. Lindsay]*
Sam A. Lindsay
United States District Judge